UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

LOUIS MARTIR AND LILIANA MARTIR,

      Plaintiffs,

 -v-                                                     No.  07 Civ. 7922 (LTS)(KNF)

THE CITY OF NEW YORK, THE NEW
YORK CITY HEALTH AND HOSPITALS
CORPORATION, JOSE R. SANCHEZ,
FRANK J. CIRILLO and ALAN D. AVILES,

      Defendants.

-------------------------------------------------------x

## OPINION AND ORDER[1]

Louis Martir ("Plaintiff"), the former Executive Director of The Metropolitan Hospital Center ("MHC") for the New York City Health and Hospitals Corporation ("HHC"), and Liliana Martir, Plaintiff's spouse ("Mrs. Martir"), bring this civil action asserting a First Amendment retaliation claim under 42 U.S.C. § 1983, against the City of New York, the New York City Health and Hospitals Corporation, Jose R. Sanchez, a Senior Vice President of MHC and Plaintiff's immediate supervisor, Frank J. Cirillo, the Senior Vice President of Operations for HHC and Alan D. Aviles, the President of HHC.  Plaintiff alleges that he was improperly terminated from his position as Executive Director of MHC in retaliation for exercising his rights

---

      [1] *The ECF system provides notice of the entry of this Order to each party that has both entered an appearance in this case and registered with ECF.  The ECF-registered attorneys are responsible for providing notice to any co-counsel whose e-mail addresses are not reflected on the ECF docket for this case, and Plaintiff's counsel, upon receiving notice of this Order, is hereby ordered to fax or otherwise deliver promptly a copy to all parties who are not represented by ECF-registered counsel.  A certificate of such further service shall be filed within 5 days from the date hereof.  Counsel who have not registered for ECF are ordered to register immediately as filing users in accordance with the Procedures for Electronic Case Filing.*

under the First Amendment to the United States Constitution in complaining about MHC practices that jeopardized public health and safety.[2] The Court has jurisdiction of this matter pursuant to 28 U.S.C. § 1331.

Defendants move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. The Court has reviewed thoroughly and considered carefully all of the parties' submissions and, for the reasons explained below, Defendants' motion is granted.

BACKGROUND

The following material facts are undisputed unless otherwise indicated. Plaintiff Louis Martir is a former Executive Director of HHC's Metropolitan Hospital Center. (Decl. Of Christopher A. Seacord in Support of MSJ ("Seacord Decl."), Ex. B, Pl.'s Dep. at 29-30.) Plaintiff assumed this position on September 9, 2002. (Id. at 29.) During Plaintiff's tenure as Executive Director, MHC was one of three acute-care facilities in HHC's Generations Plus/Northern Manhattan Health Network. (Id. at 31.) The other two acute-care facilities in this network are Lincoln Medical and Mental Health Center and Harlem Hospital Center. (Id.) Plaintiff applied for the Executive Director position after being contacted by Defendant Jose Sanchez, whom Plaintiff knew from their previous employment at Bronx-Lebanon Hospital. (Id. at 30.) At all relevant times, Defendant Sanchez has held the title of Senior Vice President of Generations Plus Northern Manhattan Health Network, as well as the title of Executive Director

---

[2] Plaintiff originally raised claims under 42 U.S.C. § 1983; New York State Labor Law §§ 740 and 741; New York State Civil Service Law §§ 75 and 75-b; New York City Administrative Code § 12-113; violations of Plaintiff's right to privacy; and defamation and slander claims pursuant to New York State Law. Defendants' summary judgment motion addressed all of those claims. In response to Defendants' summary judgment motion, Plaintiffs submitted a memorandum of law in which they indicated their intent to withdraw and discontinue all claims except for Louis Martir's retaliation claims under 42 U.S.C. § 1983 (Counts one and two).

of Lincoln Medical and Mental Health Center.  (Id. at 31; Seacord Decl., Ex. C, Sanchez Dep. at 14, 37.)  After Plaintiff was contacted by Defendant Sanchez, Plaintiff applied for the Executive Director position at Metropolitan by submitting his resume and undergoing a series of interviews.  (Pl.'s Dep. at 31-32.)  Plaintiff was interviewed by Benjamin Chu, the president of HHC at the time; Defendant Jose Sanchez; Dr. John Palmer, the Executive Director of Harlem Hospital; and a committee consisting of members of the Community Advisory Board.  (Id. at 31-32, 143.)  Following the interview process, Defendant Sanchez contacted Plaintiff and offered him the position of Executive Director of Metropolitan Hospital, which Plaintiff accepted.  (Id. at 32-33.)

As an Executive Director, Plaintiff was an at-will "Group 11" employee who served at the pleasure of his direct supervisor, Defendant Sanchez.  (Id. at 33, 184; Seacord Decl., Ex. D, Cirillo Dep. at 15-16, 81.)  Plaintiff was not under contract and his employment could have been terminated at any time for any reason.  (Pl.'s Dep. at 33; Cirillo Dep. at 15-16; see also Seacord Decl., Ex. E, HHC Operating Procedure No. 20-39 at 2.)  Plaintiff's duties and responsibilities as Executive Director of MHC included, inter alia, the following: (1) "Direct[ing] and coordinat[ing] all activities of staff and support services to maximize cost-effective operations;" (2) "Direct[ing] the implementation of Corporate programs and policies concerning health care facility operations and coordinat[ing] activities between facility staff and Corporate Officers;" (3) "Select[ing] and appoint[ing] department heads; establish[ing] an organizational structure which delineates authority, responsibility and accountability levels of department heads, and includes internal control mechanisms; formal systems of financial procedures; qualifications for employment and retention of competent personnel; scope of employee health programs; provisions for general decentralized programs consistent with governing body and Corporate

policy and availability of resources;" (4) "Direct[ing] the development and maintenance of an annual budget which includes participation by and input of medical, administrative and operating staff;" (5) "Authoriz[ing] purchases of supplies and equipment in accordance with policies governing purchase procedures, product selection and evaluation, and quality and inventory control mechanisms;" (6) "Undertak[ing] construction and alteration programs including acquisition and replacement of equipment for facility;" and (7) "Schedul[ing], and conduct[ing] and/or participat[ing] in regular interdepartmental and departmental meetings; designat[ing] hospital departmental representatives to medical staff and multi-disciplinary committees to facilitate effective communication lines within the hospital." (Seacord Decl., Ex. F, Position Description at 1-2; see also Pl.'s Dep. at 33-34.) In addition to the duties listed in the Position Description for the Executive Director position, Plaintiff also had the authority to participate in the negotiations of the affiliation contract between MHC and New York Medical College (the "Affiliation Contract"), renew or decline to renew contracts and agreements between MHC and outside vendors and service providers, as well as allocate and redistribute funds between the various hospital departments. (Pl.'s Dep. at 55, 74, 182-184.)

According to Defendants, Plaintiff's performance as Executive Director of MHC was criticized by his supervisors, Defendants Sanchez, Cirillo and Aviles, as exhibiting poor judgment and erratic behavior, particularly in the last year of his employment. (Sanchez Dep. at 89-94; Cirillo Dep. at 113; Seacord Decl., Ex. Q, Aviles Dep. at 17-18.) Plaintiff denies this characterization of his performance, citing former MHC Senior Associate Executive Director for Human Resources Gary Calnek, in which Calnek asserts that he had only received two complaints about Plaintiff during his own tenure in Human Resources (December 1992 to

December 2004) and had never himself observed Plaintiff behaving inappropriately. (Declaration of Edward S. Bosek in Opposition to Defendants' MSJ ("Bosek Decl."), Ex. 4, Calneck Aff. at ¶¶ 5, 6.) According to Defendants, while Plaintiff was employed as Executive Director of MHC, Defendant Sanchez received numerous complaints from hospital staff and other individuals expressing their opinions of Plaintiff's poor performance and erratic behavior. (Sanchez Dep. at 89-94, 106-108.) The individuals complaining about Plaintiff's performance included: (1) Victor Bekker, Chief Financial Officer of the Generations Plus Network; (2) Anne Sullivan, Deputy CFO of the Generations Plus Network; (3) Dr. Ronnie Swift, Chief of Psychiatry for the Generations Plus Network; and (4) Desiree Thompson, Associate Executive Director for Network Strategic Planning and Community and Public Affairs for the Generations Plus Network. (Sanchez Dep. at 106-108.) Complaints raised by Stewart May and Anne Sullivan to Marlene Zurack, HHC's Senior Vice President for Finance, were relayed by Zurack to Defendant Sanchez in a meeting at which Plaintiff's performance was discussed. (Seacord Decl., Ex. R, Zurack Dep. at 66-68.) However, Zurack never observed any problematic behavior herself. (Zurack Dep. at 68-69.) The complaints that Defendant Sanchez allegedly received regarding Plaintiff's performance included the following allegations: (1) he frequently cancelled meetings at the last minute or simply failed to attend; (2) he did not keep scheduled appointments or return phone calls in a timely manner; (3) he fell asleep during meetings; (4) on at least one occasion, he locked himself in his office for the entire day with the lights off and informed his secretary that he was not to be disturbed; and (5) on one occasion, he took an adolescent psychiatric patient outside to play basketball and handcuffed himself to the child's wrist so that the child could not get away. (Sanchez Dep. at 89-94; Aviles Dep. at 16-17.) Plaintiff's

financial performance as Executive Director of MHC was characterized as "abysmal" by his supervisor, Defendant Cirillo, after MHC had the largest fiscal deficit compared to all of the other acute care facilities in HHC during his tenure in this position. (Cirillo Dep. at 96-97; Aviles Dep. at 77, 88-89.)

On various occasions throughout his tenure as Executive Director of MHC, Plaintiff raised the following complaints: (1) certain contracts and agreements between MHC and outside vendors were not entered into pursuant to the proper procedures, and, accordingly, were not as beneficial financially as they otherwise might have been (Pl.'s Dep. at 53-54); (2) MHC was charged improperly for services performed at, and for employees assigned to, other facilities within the Generations Plus Northern Manhattan Health Network in violation of HHC's procedures regarding "chargebacks" (id. at 49-50, 55-56); (3) Defendant Sanchez improperly used agency vehicles for personal purposes (id. at 52-53); (4) the Affiliation Contract between MHC and New York Medical College was not in MHC's best interest (id. at 53-54); (5) the "Sodexho Contract," a contract between HHC and a consortium consisting of Sodexho, U.S. Food Services and Greater New York Hospital Associations Services, Inc., under which the latter agreed to provide dietary services to all of HHC's facilities, was not beneficial financially to MHC (id. at 59-60; Cirillo Dep. at 100-101, 114-120); and (6) MHC did not have 24-hour coverage in its Neonatal Intensive Care Unit ("NICU") (Pl.'s Dep. at 159-163).

Plaintiff raised the aforementioned complaints on the following occasions: (1) in 2003 or 2004, Plaintiff complained to Defendant Sanchez about the lack of 24-hour coverage in the NICU (Pl.'s Dep. at 161); (2) in 2004, Plaintiff complained to Ben Chu, HHC's President at the time, about the Vendor Contracts, the chargebacks, and Sanchez's inappropriate use of

vehicles (id. at 61); (3) in or about April 2005, during a meeting with Defendant Aviles, HHC's Acting President at the time, Plaintiff complained about the Vendor Contracts, the chargebacks, Defendant Sanchez's improper use of vehicles, the Affiliation Agreement, and the Sodexho Contract (id. at 50-86); (4) beginning in 2002 and continuing throughout his term as Executive Director, Plaintiff complained to Metropolitan's Community Advisory Board about the Vendor Contracts and the chargeback issues (id. at 135-36); (5) in 2003 and August 2006, Plaintiff spoke to the local Pentecostal church community about the Vendor Contracts and chargeback issues (id. at 136-40); (6) in or about April 2006, Plaintiff called HHC's Inspector General and asked for an investigation into the chargeback issues and the Vendor Contracts (id. at 127-30); and (7) in a meeting with HHC President Defendant Aviles on July 28, 2006, Plaintiff again expressed his concerns regarding the Vendor Contracts, the chargeback issues, and the Affiliation Agreement (id. at 91-94). According to Plaintiff, he also voiced his concerns regarding the Vendor Contracts and the chargeback issues to his direct supervisor Defendant Sanchez on an almost daily basis. (Id. at 132-33, 167-68.)

In or about June 2006, Plaintiff's performance as Executive Director of MHC was discussed in a meeting among Marlene Zurack, HHC's Senior Vice President for Finance, Defendant Sanchez and Victor Bekker, the CFO for the Generations Plus Network. (Sanchez Dep. at 24-26; Zurack Dep. at 63-71.) Zurack related complaints that she had received from Stuart May, MHC's CFO, and Anne Sullivan, the Deputy CFO of the Generations Plus Network, concerning Plaintiff's performance and behavior, specifically that they had complained that Plaintiff was an ineffective manager and often exercised poor judgment. (Zurack Dep. at 69-70.) Due to the concerns expressed by several staff members via Zurack as well as numerous

complaints received directly, Defendant Sanchez concluded that the corporation had lost confidence in Plaintiff's ability to effectively serve as Executive Director of MHC and decided to ask Plaintiff to resign from his position. (Sanchez Dep. at 27-28; 86-87.) Defendant Sanchez met with Defendant Aviles to inform him of the decision to ask Plaintiff to step down and asked Aviles if he had any objections to that decision. (Id. at 27-28.) Defendant Aviles did not state any objections to Defendant Sanchez's decision. (Id. at 28.)

On or about July 24, 2006, Defendant Sanchez met with Plaintiff to discuss the corporation's lost confidence in Plaintiff's ability to serve as Executive Director and asked him to resign from his position. (Pl.'s Dep. at 41-42; Sanchez Dep. at 86-87.) As of the date of that meeting, Plaintiff no longer held the position of Executive Director of MHC. (Pl.'s Dep. at 104-105.) Following the meeting, Plaintiff was asked to sign an agreement stipulating that he would resign from his position as Executive Director of MHC effective close of business November 30, 2006, and release HHC and the City of New York from any and all liability for any claims arising from Plaintiff's employment as Executive Director or his separation from that position. (Pl.'s Dep. at 97; Seacord Decl., Ex. S, First Release Agreement at 1.) Additionally, the proposed agreement stipulated that HHC would release Plaintiff from any and all liability from claims arising out of his employment with HHC, as well as allow Plaintiff to remain on the payroll after the date of his separation until all annual and sick leave accrued as of the date of his resignation was exhausted. (First Release Agreement at 2.)

On or about July 28, 2006, Plaintiff met with Defendant Aviles to discuss Defendant Sanchez's decision to ask for his resignation. (Pl.'s Dep. at 46-39; Aviles Dep. at 101-102.) During the meeting, Plaintiff expressed his belief that he had been performing well as

Executive Director of MHC and that the decision to ask him to resign was an unfair one. (Aviles Dep. at 101-102.) Additionally, during this meeting, Plaintiff stated that he believed that certain expenses were unfairly allocated to MHC that should have been allocated to other facilities in the Generations Plus/Northern Manhattan Health Network through "chargebacks." (Aviles Dep. at 103-104.) Defendants state that this was the first time Plaintiff brought this issue to Defendant Aviles' attention. (Id.) Plaintiff maintains that he complained about "chargebacks" to Defendant Aviles as early as March or April 2005. (Pl.'s Dep. at 50.)

Defendant Aviles met with Defendant Cirillo in July 2006 to discuss the possibility of finding Plaintiff a different position within HHC. (Aviles Dep. at 106-107.) Defendant Aviles offered Plaintiff a consultant position at HHC's Woodhull Medical and Mental Health Center in Brooklyn. (Pl.'s Dep. at 96; Cirillo Dep. at 81-82; Aviles Dep. at 106-107.) Plaintiff declined the offer. (Pl.'s Dep. at 96.)

On August 3, 2006, Plaintiff met with Defendant Cirillo to request to be allowed to stay on HHC's payroll for several months longer than was stipulated in the first proposed agreement. (Pl.'s Dep. at 111-112.) In response to Plaintiff's request to remain on HHC's payroll for a longer period than was outlined in the First Agreement, Plaintiff was offered a second agreement that extended the effective date of his resignation to February 28, 2007. (Seacord Decl., Ex. U, Second Release Agreement at 1.) Plaintiff declined to sign the second agreement, and Plaintiff's employment was terminated effective September 8, 2006. (Cirillo Dep. at 78; Seacord Decl., Ex. V, Termination Letter.)

D<span style="font-variant:small-caps">ISCUSSION</span>

Summary judgment in favor of a moving party is appropriate where the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(c). In opposing the motion, the nonmoving party may not rest on mere arguments that there are contested facts, but must "set forth specific facts showing that there is a genuine issue." Fed. R. Civ. P. 56(e). The facts will be viewed in the light most favorable to the party opposing the motion, and all reasonable inferences shall be drawn on the non-movant's behalf. Am. Cas. Co. v. Nordic Leasing, Inc., 42 F.3d 725, 728 (2d Cir. 1994). Summary judgment is not appropriate if there are disputes about material facts "such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Rattner v. Netburn, 930 F.2d 204, 209 (2d Cir. 1991). However, "[c]onclusory allegations, conjecture and speculation" do not establish a genuine issue of fact, Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998), and "[f]actual disputes that are irrelevant or unnecessary will not be counted," Anderson, 477 U.S. at 248.

Plaintiff's First Amendment Retaliation Claim

Plaintiff asserts a First Amendment retaliation claim against Defendants, claiming that Defendants retaliated against him for the various complaints he made during his tenure as Executive Director by asking him to resign and eventually terminating his employment. Plaintiff asserts that the complaints he made during his employment were made as a citizen and addressed a matter of public concern and that this speech was not pursuant to his official duties. Therefore,

Plaintiff asserts, his speech was protected by the First Amendment. Plaintiff further asserts that his protected speech was a motivating factor in his termination and that his termination thus violated his constitutional rights..

Title 42 U.S.C. § 1983 provides a civil remedy to any citizen subjected to the deprivation of rights, privileges or immunities secured by the Constitution and laws of the United States. The three-part test articulated in Johnson v. Ganim, 342 F.3d 105 (2d Cir. 2003), is generally used to evaluate 42 U.S.C. § 1983 claims based on allegations of retaliation for speech protected by the First Amendment. To establish a prima facie case of First Amendment retaliation, a plaintiff must show that: (1) he spoke as a citizen on a matter of public concern; (2) he suffered an adverse employment action; and (3) the speech at issue was a substantial or motivating factor for the adverse action. Johnson, 342 F.3d at 112. If the plaintiff makes such a showing, the burden shifts to the employer to offer some legitimate, nondiscriminatory rationale for its actions. See Jeffries v. Harleston, 52 F.3d 9, 13 (2d Cir. 1995).

Accordingly, the initial inquiry is whether the plaintiff's speech was made in the capacity of a citizen and was about a matter of public concern. A public employee speaking pursuant to his official job duties is not, as a matter of law, speaking in the capacity of a citizen and thus is outside the scope of First Amendment protection. Garcetti v. Ceballos, 547 U.S. 410, 421 (2006). If all of Plaintiff's statements at issue in this case were made pursuant to his official duties, there will be no need to address the issue of whether or not the speech touched on a matter of public concern. Garcetti, 547 U.S. at 421, 423. See, e.g., Cullen v. City of New York, No. 07-CV-3644, 2008 WL 5159815, at *10 (E.D.N.Y. Dec. 9, 2008); Benvenisti v. City of New York, No. 04-CV-3166, 2006 WL 2777274, at *24 - *30 (S.D.N.Y. Sept. 23, 2006).

Plaintiff's Complaints

Based on the undisputed facts, it is clear that Plaintiff was not speaking as a citizen when he made the various complaints to his supervisors, but rather was speaking pursuant to his official job duties. Plaintiff's official job duties, as described in the HHC Operating Procedure and Plaintiff's deposition, make clear that each of Plaintiff's complaints was within the scope of his duties as Executive Director. Plaintiff claims that he complained to his supervisor Defendant Sanchez in 2003 or 2004 regarding the lack of 24-hour coverage in MHC's NICU. (Pl.'s Dep. at 161.) Ensuring that the facility serves its patients and community as well as possible falls under the official duty of "direct[ing] the overall management of [the] health care facility." (Position Description at 1.) Complaining about this perceived inadequacy suggests Plaintiff believed that the Hospital was not serving the community as well as it could have with 24-hour coverage in the NICU; taking steps to improve the quality of medical care is consistent with Plaintiff's duty to effectively manage the facility. Plaintiff also states that he complained about the lack of coverage as a campaign to obtain another neonatologist for the NICU. (Pl.'s Dep. at 162-163.) Plaintiff acknowledges that part of his managerial duties was to ensure that the departments had adequate resources; taking steps to secure a needed staff member is within the scope of his duty to obtain adequate resources and effectively manage the facility. (Id. at 162.) Thus, there can be no genuine issue as to whether this complaint was made pursuant to Plaintiff's duties as Executive Director and it is clear that he was not speaking as a citizen. Plaintiff has no viable First Amendment retaliation claim concerning his complaints to his supervisors regarding neonatology unit staffing.

Plaintiff claims that he made complaints regarding the Vendor Agreements to Ben

Chu in 2004, Defendant Aviles in or around April 2005 and July 2006, and Defendant Sanchez regularly during Plaintiff's tenure as Executive Director. (Pl.'s Dep. at 50-86, 91-94, 131-132.) In making these complaints, Plaintiff aimed to enlist the help of his superiors in renegotiating and/or terminating agreements that he deemed detrimental to MHC. (Id. at 53.) Plaintiff's official duties as Executive Director included ensuring that MHC's contracts were financially beneficial to the hospital; these complaints were therefore made pursuant to his official duties. (Id. at 85.) Furthermore, when complaining about the chargebacks (MHC being improperly charged for services performed at other facilities) to Defendants Aviles and Sanchez and Ben Chu, Plaintiff was acting pursuant to his duty to ensure the fiscal solvency of the hospital. (Id. at 34, 61-62; Position Description at 1.) Therefore, the chargeback and Vendor Agreement complaints do not qualify as protected speech.

>Plaintiff's complaints to Defendant Aviles regarding the Affiliation Agreement concerning the orthopedic and neurosurgical services were made with the expectation that Aviles would take action to render the agreements more financially beneficial for the hospital, as Plaintiff did not believe that these agreements were in the best interest of MHC. (Pl.'s Dep. at 53-54.) Plaintiff complained about the Sodexho contract because he believed it was not financially beneficial to the hospital and felt compelled to bring the costly contract to his supervisor's attention because the hospital was losing money. (Id. at 59-60.) As explained above, action taken by Plaintiff with the aim of making pre-existing agreements more beneficial to the hospital was action taken pursuant to Plaintiff's duty of managing the facility and ensuring that all contracts were financially beneficial to MHC. (Id. at 61-62; Position Description at 1.) Therefore, neither of these complaints was made in Plaintiff's capacity as a citizen, and neither

was protected by the First Amendment.

Plaintiff's complaints to Ben Chu and Defendant Aviles regarding Defendant Sanchez's alleged improper use of facility vehicles similarly concerned a matter of internal affairs within the scope of Plaintiff's official responsibilities and were therefore made pursuant to Plaintiff's official duty to ensure the proper and effective operation of his facility. (Pl.'s Dep. at 52-53.) As such, Plaintiff was not speaking as a citizen and his speech is not subject to First Amendment protection.

Plaintiff's numerous complaints to the Metropolitan Hospital Center Community Advisory Board regarding his issues with the Affiliation Agreements and chargebacks during his tenure as Executive Director were, similarly, directly pursuant to Plaintiff's official duty to maintain a relationship with the community. (Pl.'s Dep. at 135-136; Position Description at 1.) The Community Advisory Board is comprised of representatives of the community served by MHC, and exists "to consider and advise the corporation and the hospital upon matters concerning the development of any plans or programs of the corporation . . . ." (See NY CLS Unconsol. Ch. 214-A § 4(11).) As outlined in his official duties, Plaintiff was responsible for attending meetings with the Community Advisory Board to discuss issues involving the success of the hospital. (Pl.'s Dep. at 144-52; Sanchez Dep. at 105; Position Description at 2.) Plaintiff maintains that he raised the issues with the Advisory Board in order to enlist its assistance in improving the agreements and correcting the chargeback issue. (Pl.'s Dep. at 148.) These complaints to the Community Advisory Board are clearly pursuant to Plaintiff's official duties and are therefore not protected by the First Amendment.

Nor are Plaintiff's complaints to the HHC Inspector General regarding the Vendor

contracts and chargebacks issues protected by the First Amendment, as Plaintiff concedes that he felt compelled by his position to bring issues of this type, regarding the efficient operation of the facility, to the attention of the inspector general.  (Pl.'s Dep. at 127-31.)   See Abato v. New York City Off-Track Betting Corp., No. 03-CV-5849, 2007 WL 1659197, at *22- *23 (S.D.N.Y. June 7, 2007) (holding that complaints brought by a plaintiff that were pursuant to a duty to bring issues to the attention of the inspector general that was admitted by plaintiff but not explicitly outlined in the official duties did not constitute protected speech).  As Plaintiff admittedly had the duty to report these issues, he was not speaking as a citizen and thus his speech does not constitute protected speech for the purpose of a First Amendment retaliation claim.

       Finally, Plaintiff's complaints regarding the Vendor contracts and chargeback issues to the Pentecostal church community in 2003 and August 2006 were pursuant to his duty to maintain a cooperative relationship with the community on matters that involved the hospital's service to the community.  (Pl.'s Dep. at 136-137; Position Description at 2.)  According to Plaintiff, the church requested an opportunity to discuss with him its concerns regarding MHC's contracts and budget.  (Pl.'s Dep. at 136.)  Plaintiff's discussion with the community regarding these matters in response to its concerns thus was pursuant to his duties to cooperate with the community and did not constitute protected speech, as Plaintiff was not speaking as a citizen. (Pl.'s Dep. at 136 -37; Position Description at 2.)

       Taking Plaintiff's duties as a whole, he was responsible for ensuring the efficient operation and fiscal solvency of MHC.  The undisputed record demonstrates that each and every complaint cited by Plaintiff was related to this responsibility.  As none of Plaintiff's complaints was made in his capacity as a citizen but rather all were made pursuant to official duties, his

arguments that his speech addressed matters of public concern raise no material factual issues and Defendants are entitled to judgment as a matter of law dismissing his First Amendment retaliation claim.  See Garcetti, 547 U.S. at 421, 423.

State Law Claims, Loss of Consortium Claim

In his papers in opposition to Defendants' summary judgment motion, Plaintiff Louis Martir declines to pursue, and withdraws, all his claims against Defendants other than his Section 1983 claims.  Accordingly, Counts three, four, five, six and seven of the Complaint will be dismissed with prejudice pursuant to Rule 41 (a)(2).

It is unclear whether Liliana Martir intended to continue to pursue her loss of consortium claim, which is not addressed in Plaintiffs' opposition papers.  That claim must, in any event, be dismissed, because Plaintiff Louis Martir has not succeeded in establishing liability on his primary claim.

## Conclusion

For the reasons explained above, Defendants' motion for summary judgment dismissing Plaintiff's claim pursuant to 42 U.S.C. § 1983 and Liliana Martir's loss of consortium claim is granted and all of Plaintiff's other claims are dismissed voluntarily, with prejudice.

This decision resolves docket entry no. 27.

Because there is unresolved litigation concerning the propriety of Plaintiff's acquisition of certain documents and the parties' rights with respect to custody and disclosure of those documents, the outcome of which will have no bearing on this decision dismissing Plaintiffs' claims, the Court finds that there is no just reason for the delay of entry of final judgment pursuant to Federal Rule of Civil Procedure 54(b) dismissing Plaintiffs' claims.

Accordingly, the Clerk of Court is respectfully requested to enter judgment pursuant to Rule 54(b) in accordance with this decision, granting summary judgment to Defendants with respect to Plaintiffs' 42 U.S.C. § 1983 and loss of consortium claims, and voluntarily dismissing with prejudice the remainder of Plaintiffs' claims.

SO ORDERED.

Dated: New York, New York
       July 23, 2009

LAURA TAYLOR SWAIN
United States District Judge